# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>Records and information associated with the cellular<br>device assigned call number (920) 381-8829, in the<br>custody/control of Verizon Wireless. (See Attachments) | )<br>)<br>)  Case No.23-900M(NJ)<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before 5/5/2023_____ *(not to exceed 14 days)*
❐ in the daytime 6:00 a.m. to 10:00 p.m.     xx❐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. Nancy Joseph_____.
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☑ for  30  days *(not to exceed 30)*     ❐ until, the facts justifying, the later specific date of _____.

Date and time issued:4/21/2023 @11:12 a.m._____

_____
*Judge's Signature*

City and state:   Milwaukee, WI_____

Hon. Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# ATTACHMENT A
## Property to Be Searched

1.      Records and information associated with the cellular device assigned call number 920-381-8829 (referred to herein and in Attachment B as "the Target Cell Phone"), that is in the custody or control of Verizon Wireless (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered at 1092 Avenue of the Americas, New York, NY 10036.

2.      The Target Cell Phone.

**ATTACHMENT B**
**Particular Things to be Seized.**

**I.     Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

    a.  The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phones for the time period from February 1, 2023, to present:

        i.  Names (including subscriber names, usernames, and screen names);

        ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.  Local and long-distance telephone connection records;

        iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

2

v. Length of service (including start date) and types of service utilized;

vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phones, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone

3

numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as per-call measurement data (also known as "real-time tool" or "RTT").

b. Information associated with each communication to and from the Target Cell Phones for a period of 30 days from the date of this warrant, including:

   i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

   ii. Source and destination telephone numbers;

   iii. Date, time, and duration of communication; and

   iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phones will connect at the beginning and end of each communication, as well as per-call measurement data (also known as "real-time tool" or "RTT").

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the Target Cell Phone.

c. Information about the location of the Target Cell Phone for a period of 30 days, during all times of day and night. "Information about the location of the Target Cell Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

    i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cell Phones on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

**II.**     This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

### III. Information to be Seized by the Government

All information described above in Section I that constitutes evidence and instrumentalities of possible crimes of distribution and possession with intent to distribute controlled substances, violations of Title 21, United States Code, Section 841(a)(1), involving LEE and THREETS, and other unidentified subjects during the period of February 1, 2023 to present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

6

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Records and information associated with the cellular<br>device assigned call number (920) 381-8829, in the<br>custody/control of Verizon Wireless. (See Attachments) | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No.23-900M(NJ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Eastern_____ District of _____Wisconsin_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C § § 841(a)(1) | Possession with intent to distribute and distribution of controlled substances |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

LUKE BARKER    Digitally signed by LUKE BARKER
Date: 2023.04.20 15:16:20 -05'00'

*Applicant's signature*

SA Luke Barker, ATF

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means)*.

Date:4/21/2023

*Judge's signature*

City and state:   Milwaukee, WI      Hon. Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

I, Luke Barker, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number 920-381-8829 (the "Target Cell Phone"), with listed subscriber unknown, whose service provider is Verizon Wireless ("Service Provider") a wireless telephone service provider headquartered at 1092 Avenue of the Americas, New York, NY 10036. The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.     In this application, the United States seeks (1) historical cell-site location information; (2) historical precision location information; (3) prospective, real-time cell-site location information; (4) prospective, real-time precision location information (i.e., E-911 Phase II data and GPS); and (5) subscriber information and other historic non-content records and information.

3.     Because this warrant application seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123,

1

authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the Target Cell Phone.

## BACKGROUND, TRAINING & EXPERIENCE

4.    I am a Special Agent of the United States Justice Department, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), currently assigned to the Milwaukee Field Office.  I have been so employed since November 2015.  My duties as a Special Agent with ATF include investigating alleged violations of various federal statutes.  In my 14 years of law enforcement experience I have had or assisted with various investigations involving the possession and distribution of illegal narcotics.

5.    I have completed approximately 26 weeks of training at the Federal Law Enforcement Training Center (Glynco, Georgia), as well as the ATF National Academy. That training included various legal courses related to Constitutional Law as well as search and seizure authority.  Additionally, I have received training on how to conduct various tasks associated with criminal investigations, such as: interviewing, surveillance, and evidence collection.    As a police officer for the Aurora Police Department, I completed approximately 24 weeks of training at the Aurora Police Academy.

6.    I have had a variety of formal, informal, and on the job training in the investigation of illegal firearms possession and firearms trafficking. In addition, I have

2

participated in the execution of search warrants in which firearms, ammunition, and controlled substances were seized in violation of state and federal laws. I know from training and experience that those that commit crimes commonly communicate, photograph, videotape, and organize using electronic devices, including by phone call, text message, electronic mail, messaging application, and social media. Additionally, I am familiar with street name(s) of firearms, controlled substances, and respective related topics, as well as has knowledge of the use of money laundering to conceal ill-gotten money.

7.      I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During the course of my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

8.      I have participated in the execution of numerous search warrants in which weapons, narcotics, and/or evidence of drug trafficking were seized. I am familiar with the different types and calibers of firearms and ammunition commonly possessed for

3

illegal purposes, as well as the methods used to conduct narcotics trafficking.

9.    Information contained in this affidavit was either obtained directly by me or by other investigators who I believe to be truthful and credible. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

10.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that possible crimes of distribution and possession with intent to distribute controlled substances, violations of Title 21, United States Code, Section 841(a)(1) have been committed by Tom LEE (XX/XX/1987) and other unidentified subjects.   There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## JURISDICTION

11.    The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

12.    Beginning in February of 2023, ATF Special Agents (SAs) and Officers from the Lake Winnebago Area Metro (LWAM), hereinafter referred to as "Investigators," began investigating an armed drug trafficking organization operating in the Eastern District of Wisconsin (WI).

4

13. On February 21, 2023, SAs Alex Erlien and Paul Kozelek of the ATF met with a confidential human source (CHS) at Fox Lake Correctional Institution (FLCI). The CHS advised ATF SAs that he was recently approached by Sherman THREETS (XX/XX/1984) who was known to the CHS from when they both were in a local jail in the Winnebago area of WI approximately 10 years ago. For several reasons, your affiant believes that the CHS is reliable and credible. Primarily, the information provided by the CHS is consistent with evidence obtained elsewhere in this investigation where CHS was not utilized, and substantial portions of CHS' information has been corroborated through independent investigation. The CHS has prior felony convictions for theft under false pretenses, forgery/uttering (five convictions), misappropriation of identification, theft with habitual criminality, and armed robbery with habitual criminality. The CHS is cooperating with law enforcement in exchange for monetary compensation and for potential consideration on the prison sentence he is currently serving. Finally, the CHS has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed herein. For these reasons, case agents believe the CHS to be reliable.

14. THREETS told the CHS that he did 10 years in the federal prison system for a large drug case and now has more pending federal drug charges while at FLCI. THREETS advised the CHS that he was caught with 14 pounds of methamphetamines and 3 kilograms of cocaine. THREETS asked the CHS if he knew anyone who would be willing to find THREETS someone to take his charges for him in exchange for a good

5

price on kilograms of cocaine. Your affiant is aware that "take his charges" of "take the case" are slang terms that mean having someone intentionally lie and admit that they did the illegal activity that someone else did, and has been charged with, as a way of fraudulently proving the person charged' s innocence. THREETS provided the CHS a visitor form to have filled out by whoever the CHS knew that would be willing to take his case. The visitor form would then be turned in by THREETS so that THREETS could meet this person during a visitation. During the visitation, THREETS and this person would then arrange the delivery of the kilograms of cocaine and how that person would take THREETS' case for him. The CHS stated that he told THREETS that he would reach out to his brother to see if he knew of anyone that would being willing to do this for THREETS. The CHS did not reach out to anyone and instead provided this information to ATF SAs.

15.    After the CHS and the ATF SAs ended their meeting, SA Erlien asked Capt. Schueler of FLCI to check his internal database for THREETS. Capt. Schueler advised SA Erlien that THREETS is currently in custody at the FLCI and is awaiting trial for a federal conspiracy to distribute a controlled substance case stemming from the Eastern District of Wisconsin. After leaving FLCI, SA Erlien contacted Investigators from LWAM who confirmed that THREETS' current charges stem from a drug investigation with LWAM. LWAM investigators also confirmed that THREETS is a large-scale drug dealer and that he would have access to kilogram weights of drugs and that they have had information that THREETS has attempted to influence Confidential

Informants and other witnesses in the past in order to have them falsify their testimony. LWAM investigators confirmed that THREETS was arrested with approximately 12 pounds of methamphetamines in his house when he was arrested.

16.     On March 2, 2023, ATF SAs met with the CHS at FLCI.  During this meeting the CHS provided SA Erlien a FLCI visitor questionnaire that was filled out and signed by THREETS.  THREETS gave this form to the CHS to have the CHS send it off to someone who would be willing to meet THREETS and discuss taking his case for him.  THREETS signed and dated that form on 02/13/2023.  The visitor form is meant to be filled out by an inmate if they have someone they want to be placed on their list of approved visitors.  The FLCI mandates that the inmate fills out a portion about their information and sign it before mailing it to whomever they wish to have placed on their visitor list.  The recipient then must place their information on the form and mail it back into the FLCI so that they can be background checked and then placed on the inmate's visitation list.

17.     During the meeting, the CHS advised ATF SAs that THREETS further explained to the CHS that he was moving kilograms of drugs from the west side of Chicago to the Lake Winnebago area.  THREETS, being aware that the CHS is familiar with the west side of Chicago, told the CHS that the kilograms were coming from a place near the intersection of Loomis and Roosevelt.

18.     On March 7, 2023, SA Erlien filled out the original FLCI visitation form that was provided to the CHS by THREETS with the ATF UC's information.  That form

7

was then sent via USPS first class mail to the FLCI visitor processing. Approximately 1-2 weeks later, SA Erlien was advised that the UC's (this UC will hereinafter be referred to as SA # 6208) visitor application was approved for him to visit with THREETS.

19.     On 03/10/2023, at approximately 7:00pm, SA # 6208 received a phone call from THREETS.  THREETS asked if SA # 6208 had gotten the "visiting form" to which SA # 6208 replied, that he did and that he had submitted it earlier in the week. THREETS stated that now that he knows SA # 6208 submitted that form, he will "shoot a request" to the staff asking them to process a visitor form that should have been received by FLCI for him.

20.     On March 29, 2023, SA # 6208 met with THREETS at the FLCI in an UC capacity.  THREETS expressed his appreciation for SA # 6208 coming to meet with THREETS and asked SA # 6208 about the criminal enterprise SA # 6208 represented. SA # 6208 informed THREETS that SA # 6208 belonged to an Outlaw motorcycle gang (OMG) that trafficked illegal drugs, firearms, and explosives. SA # 6208 informed THREETS that SA # 6208's OMG was active in the Midwest region; however, the OMG was seeking to expand their illegitimate businesses into additional regions of the United States.

21.     THREETS explained his goal for that day's meeting was to "get on the same page" with SA # 6208 regarding the possibility of SA # 6208 assuming the legal responsibility for THREETS's current federal criminal charges. Without any prompting from SA # 6208, THREETS provided SA # 6208 with details regarding THREETS's

8

historic and current criminal activity which included detailed information regarding his drug trafficking operations and that he was recently arrested in conjunction with a search warrant that yielded "12 pounds of ice [methamphetamine], 3.5 bricks [kilograms] of coke[cocaine], and 100 grams of fentanyl" being recovered from THREETS.

22.     After THREETS detailed his current criminal charges, THREETS asked, "What y'all need from me. what y'all expect from me *inaudible*?" SA # 6208 explained in exchange for SA # 6208 assuming full responsibility for THREETS's current federal drug charges, SA # 6208's OMG expected long-term supply of methamphetamine from THREETS/THREETS's methamphetamine source. SA # 6208 stated his OMG was trafficking 2-4 pounds of methamphetamine per month; however, the OMG was looking to increase the amount of methamphetamine being trafficked to 10-15 pounds per month.   SA # 6208 further explained that before he would be taking full responsibility for THREETS's case THREETS would need to organize SA # 6208 getting supplied methamphetamine up front and before THREETS is released from prison.

23.     THREETS stated he could possibly contact a methamphetamine source in "Appleton" (WI). THREETS described this individual as an Asian male named "Tom LEE." THREETS claimed he trusted LEE and has known LEE for a significant amount of time through the illegal drug trade. THREETS stated he has "fronted" methamphetamine to LEE in the past and also stated, "He's [LEE] a middleman type of dude. He's not really one of my people that you're gonna meet. What I know. he has

9

access to what I need, and he'll do what I need him to do because he wants me to be plugged in too... My little homie, he's a good little dude. Uhhh.. he's a good little dude, he really is." SA # 6208 informed THREETS that SA # 6208 would be open to purchasing methamphetamine from LEE, despite the fact LEE would not be the long-term methamphetamine source for the OMG. THREETS then stated, "I'm going to try to reach out to him myself. If I don't, you're going to have to call him yourself and tell him, 'Hey Sherman wants to get ahold of you he needs to talk to you this is important.'" SA # 6208 informed THREETS that SA # 6208 did not have any issue with this arrangement.

24. THREETS stated LEE would potentially have two pounds of methamphetamine readily available, but if LEE did not have this amount, LEE would have to "travel" to obtain the substance. THREETS stated, "If he [LEE] does have to travel, I got some people who will give it to him for two [$2,000]." SA # 6208 and SA Erlien understood THREETS's statements to mean if LEE needed to "travel" to obtain the methamphetamine, LEE would obtain the drugs from THREET's "people." Furthermore, THREETS knows that if LEE obtained the methamphetamine from THREETS's "people," the price for each pound of methamphetamine would be $2,000 due to the fact THREETS knows his "people's" methamphetamine prices.

25. SA # 6208 and THREETS agreed that SA # 6208 would return to FLCI once THREETS had contacted LEE so that SA # 6208 could obtain LEE's contact information from THREETS. To avoid detection by law enforcement, SA # 6208 and THREETS agreed they did not want to discuss LEE's information via recorded prison telephone

10

call. THREETS explained, "I will reach out to him [LEE]. I want you to come back up here and I want to personally give you the information I have on him."

26.     On March 29, 2023, shortly after SA # 6208 met with THREETS, SA Erlien received a call from the CHS.  The CHS advised that THREETS was attempting to contact a subject named Tommy LEE as a source of supply for SA # 6208 but that LEE was not answering his phone.  CHS provided SA Erlien the phone number of 920-777-2075 and stated that this was LEE's number that THREETS was trying to call.  SA Erlien queried that number through a law enforcement database and found that there was no subscriber information tied to the number and that it was a landline number in the area of Green Bay, WI.

27.     SA Erlien spoke with investigators with LWAM regarding Tom LEE and asked if they were familiar with him.  Investigators with LWAM stated that they were familiar with LEE and that he is known to be a pound level dealer of methamphetamines and marijuana in the Appleton WI area.  Investigators described LEE as the leader of a local gang call the "Crip Killers" and advised that LEE was known to be armed.  They also advised SA Erlien that LEE was on probation for Felon in possession of a firearm and possession of methamphetamine (both of which are felony convictions).

28.     On April 14, 2023, SA # 6208 spoke with THREETS who stated that he wanted to meet SA # 6208 again at the FLCI.  On April 14, 2023, SA # 6208 met with THREETS at the FLCI in an UC capacity. SA # 6208 was provided two telephone

11

numbers that could be utilized to contact Tom LEE by THREETS. THREETS provided the two telephone numbers, 920-777-2075 and 920-381-8829, on a small sheet of paper. THREETS informed SA # 6208 that the telephone number written in black ink (920-777-2075) belonged to LEE's romantic partner, while the telephone number written in blue (920-381-8829) (Target Cell Phone) was LEE's personal line. THREETS advised that should SA # 6208 be unable to reach LEE at telephone number (920) 381-8829 (Target Cell Phone) SA 608 should call LEE's romantic partner (920-777-2075) and request to speak with LEE. THREETS explained that he had previously informed LEE that SA # 6208 would be contacting LEE and that LEE should accept SA # 6208's call. THREETS stated that THREETS had previously spoken to LEE with respect to providing SA # 6208 with illegal drugs, and also that LEE was "waiting on you [SA # 6208] to call him [LEE]."

29.     On April 18, 2023, SA Erlien reviewed recorded jail calls from THREETS to phone number 920-777-2075 and to 920-381-8829 (Target Cell Phone). SA Erlien determined that on April 3, 2023 THREETS called 920-777-2075. It should be noted that this date is approximately 4 days after SA # 6208 met with THREETS the first time, detailed in paragraphs 22-27. During the phone call, THREETS asks if "he" is around, and a female speaks to THREETS and advises him that he is not home yet. THREETS clarifies that "he aint make it out yet?" to which the female responds, "the 11th". THREETS advises the female that he will be calling back after the 11th to talk to LEE.

30.     On April 13, 2023, THREETS also called 920-777-2075. The same female

12

answered the phone again and advised that she is not with "Tom right now." THREETS asks if she has told LEE that he is trying to get ahold of him to which the female states yes. The female then offers to give THREETS LEE's number and provides THREETS the number of 920-381-8829 (Target Cell Phone) and explains that LEE got a new phone number. THREETS and the female then talk briefly about how her, and LEE's relationship is doing and how they are currently not together.

31. On April 13, 2023, THREETS called 920-381-8829 (Target Cell Phone), immediately after he made the above-mentioned phone call. A male answered the phone and THREETS says "T whatup?" and confirms that the male knows it is THREETS calling. THREETS and the male discuss then discuss that THREETS just called his "girl" and that she says they are not doing well as a couple. The male agrees that they are not doing well but states that they should be good. THREETS then asks the male "whats goin on" to which the male says, "not much, just getting my shit together you know what I am saying?" SA Erlien knows that often subjects will talk in code over a jail phone due to the fact that they know the line is recorded and this allows them to hide their illegal activity from law enforcement. THREETS then says that he wants to send his "little homie" to meet with the male and discuss with him about THREETS's freedom and that THREETS needs him to "come through". SA Erlien is aware that often "come through" is a slang used by drug dealers to explain that they are able to supply the amount of drugs requested of them. The male tells THREETS "give him my number or something" to which THREETS asks "can you help him?" to which

13

the male responds "umm not yet give me like a week or so".  THREETS tells this male

that he is going to give "Dwayne" the male's number and will tell "Dwayne" to call him

in about a week. ("Dwayne" is the UC name used by SA # 6208.)  The male states that

he understands and that he will answer the phone when "Dwayne" calls him.

THREETS then clarifies with the male that "this is your number right?" to which the

male responds "yep".

      32.    Your affiant believes that based on the conversations between SA # 6208

and THREETS along with the information provided to SA Erlien from the CHS that the

male on the phone who goes by "T" is most likely Tom LEE.

      33.    On April 18, 2023, at approximately 7:26 P.M., SA # 6208 initiated an

outgoing call to 920-777-2075. Upon the call being connected, a female's voice answered

and asked who had called her. SA # 6208 explained he was a friend of THREETS and

was seeking to speak with "T." After a brief silence, a male's voice greeted SA # 6208,

stating, "Hey, what up?" SA # 6208 then briefly explained the nature of SA # 6208's

relationship with THREETS, stating that SA # 6208 would be assuming legal

responsibility for THREETS's federal drug charges in exchange for SA # 6208's criminal

organization being provided with multiple pounds of methamphetamine. SA # 6208

further explained that THREETS had provided SA # 6208 with LEE's telephone number

with the mutual understanding that LEE would provide SA # 6208 with multiple

pounds of methamphetamine.

      34.    After SA # 6208 explained the circumstances to LEE, LEE asked, "Okay

what are you looking for?" In this context, SA # 6208 understood this to mean LEE was asking SA # 6208 the types and amounts of illegal drugs SA # 6208 was seeking to purchase. SA # 6208 stated he wanted to purchase two pounds of methamphetamine from LEE, and in the future, SA # 6208 would be seeking to purchase larger amounts. LEE responded, "Okay" and then asked, "Wanna meet up Thursday or something. and we'll figure it out from there?" SA # 6208 stated he could meet with LEE on April 20, 2023, or April 21, 2023, depending upon SA # 6208's availability. SA # 6208 and LEE then agreed they would contact each other later to discuss the pending methamphetamine transaction.

## TECHNICAL BACKGROUND

35.     Based on my training and experience, I know that Service Provider can collect historical and prospective cell-site data and historical and prospective E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on Service Provider's network or with such other reference points as may be reasonably available.

## Cell-Site Data

36.     In my training and experience, I have learned that Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the

15

"cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

37.    Based on my training and experience, I know that Service Provider can collect cell-site data on a historical and prospective basis about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business to use this information for various business-related purposes.

### E-911 Phase II / GPS Location Data

38.    I know that some providers of cellular telephone service, including Service Provider, have technical capabilities that allow them to collect and generate E-

911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.

39.     As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.

40.     I also know that certain wireless providers, such as Service Provider, can provide precision location information, also known as estimated location records or historical handset location data, on both a historical and prospective basis. Each provider refers to its proprietary estimates of a cellular device's location differently. This information, however, is sometimes referred to as geolocation information (PING), Network Event Location System (NELOS) data, Global Positioning System (GPS) data, cell tower triangulation or trilateration, round-trip time or real-time tool (RTT), per-call measurement data (PCMD), historical E911 data, or precision measurement information.

41.     Based on my training and experience, I know that Service Provider also can collect per-call measurement data, which Service Provider also refers to as the "real-

17

time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

42.     Accordingly, cell-site data is typically less precise that E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available.

### Pen-Trap Data

43.     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it.  Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

### Subscriber Information

18

44.     Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business.

45.     In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify Target Cell Phone's user or users, the locations of that user or users, and the patterns of that user or users. A frequency analysis of the telephone communications between LEE and THREETS, along with other unidentified subjects is material, in that it can establish whether the calls described above are a deviation from their normal patterns of communication. The frequency analysis of the locations associated with the cellular devices can establish whether the locations are deviations or consistent with normal patterns. This information is relevant to show whether LEE, THREETS, and others acted-in-concert, by establishing the nature and extent of their relationship, the

19

existence and scope of the conspiracy, the pattern of their communications, their patterns of travel, and any deviations from those patterns.

## AUTHORIZATION REQUEST

46. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

47. I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

48. I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the locations of the Target Cell Phones on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

49. Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further

request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

**ATTACHMENT A**
**Property to Be Searched**

1.    Records and information associated with the cellular device assigned call number 920-381-8829 (referred to herein and in Attachment B as "the Target Cell Phone"), that is in the custody or control of Verizon Wireless (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered at 1092 Avenue of the Americas, New York, NY 10036.

2.    The Target Cell Phone.

1

**ATTACHMENT B**
**Particular Things to be Seized.**

I.     **Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

   a.   The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phones for the time period from February 1, 2023, to present:

      i.   Names (including subscriber names, usernames, and screen names);

      ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

      iii. Local and long-distance telephone connection records;

      iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

2

v. Length of service (including start date) and types of service utilized;

vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phones, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone

3

numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as per-call measurement data (also known as "real-time tool" or "RTT").

b. Information associated with each communication to and from the Target Cell Phones for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phones will connect at the beginning and end of each communication, as well as per-call measurement data (also known as "real-time tool" or "RTT").

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the Target Cell Phone.

4

c. Information about the location of the Target Cell Phone for a period of 30 days, during all times of day and night. "Information about the location of the Target Cell Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

    i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cell Phones on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

**II.** This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

5

### III. Information to be Seized by the Government

All information described above in Section I that constitutes evidence and instrumentalities of possible crimes of distribution and possession with intent to distribute controlled substances, violations of Title 21, United States Code, Section 841(a)(1), involving LEE and THREETS, and other unidentified subjects during the period of February 1, 2023 to present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.